Ansel Byron THOMAS et al.

v.

The **UNITED STATES** and Beech Creek Railroad Company and Penn Central Company, Third-Party Defendants.

No. 352–69.

United States Court of Claims.

Nov. 20, 1974.

William A. Bradford, Jr., Washington, D. C., attorney of record, for plaintiffs. Hogan & Hartson, Washington, D. C., of counsel.

David W. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

William P. Jones, New York City, attorney of record, for third-party defendants.

Before COWEN, Chief Judge, and SKELTON and MILLER,* Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiffs' exceptions to the recommended decision filed March 12, 1974, by Trial Judge C. Murray Bernhardt pursuant to Rule 134(h), having been submitted and considered upon the briefs and oral argument of counsel.

Since the court agrees with the trial judge's recommended decision, as to the claims of the plaintiffs against the defendant, as hereinafter set forth, it hereby affirms and adopts the said decision as the basis for its judgment as to these claims in this case. It is therefore concluded that plaintiffs are not entitled to recover on their claims and, as to them, the petition is dismissed.

▇ In view of this court's decision in Bowser Inc. v. United States, 420 F. 2d 1057, 190 Ct.Cl. 441 (1970), the court concludes that it has no jurisdiction of the claim asserted in the petition of the United States against the third-party defendants. It is therefore ordered that the petition of the United States against Beech Creek Railroad Company and Penn Central Company (now Penn Central Transportation Company) be and the same is hereby dismissed.

On the basis of this court's decision in Rolls-Royce Limited v. United States, 364 F.2d 415, 176 Ct.Cl. 694 (1966), the court concludes that it has no jurisdiction of the counterclaim by the third-party defendants against the plaintiffs. It is therefore ordered that the counterclaim of Beech Creek Railroad Company and Penn Central Company (now Penn Central Transportation Company) be and the same is hereby dismissed.

## OPINION OF TRIAL JUDGE

### BERNHARDT, Trial Judge:

The plaintiffs claim Fifth Amendment just compensation for the alleged taking in 1964 of their leasehold, sidetrack, and coal tipple beside the main line of the New York Central Railroad[1] at Bells Landing, Pennsylvania. The taking was consequent to a flood control project on the West Branch of the Susquehanna River undertaken by the United States pursuant to the Flood Control Act of 1954. 68 Stat. 1248, 1257. The project entailed construction of the Curwensville Reservoir, which necessitated relocation of the Railroad right-of-way and tracks in the affected area. In lieu of authorized land condemnation proceedings the United States contracted with the Railroad for the latter to remove, at Government expense and under its supervision, the tracks and structures from the superseded right-of-way, while the United States constructed a new right-of-way and tracks. In 1966, approximately 2 years after the rail traffic had been di-

---

* Associate Judge of the United States Court of Customs and Patent Appeals, sitting by designation pursuant to 28 U.S.C. § 293(a).

1. The term "Railroad" connotes collectively the Beech Creek Railroad Company, the New York Central Railroad which held a long-term lease on the property in dispute from Beech Creek, and the Penn Central Company into which the New York Central was merged. Beech Creek and Penn Central were motioned in as third-party defendants.

verted to the new track, the parties exchanged deeds whereunder the United States acquired the abandoned right of-way and the Railroad the replacement.

In 1944–45 Ansel Thomas and his late father, H. S. Thomas,[2] as partners, were assignees from one Lark of the latter's leasehold and sidetrack agreement with the Railroad providing a sidetrack and ramp adjacent to which the assignees erected in 1948 a coal tipple and accessory facilities for the weighing, cleaning, sorting, crushing, and loading of coal strip-mined from their nearby coal-bearing lands. The lease was for one year which was automatically renewable for successive yearly increments by holding over, and was terminable by the Railroad at any time on 30 days' written notice, or on 10 days' notice in the event of nonpayment or other breach by the lessees. Upon lease termination the lessee had 5 days to remove his property on penalty of it becoming Railroad property. The sidetrack agreement was not for a fixed period and was terminable by either party on 30 days' written notice. Both the lease and the sidetrack agreement required the written consent of the Railroad to any assignment or subleasing. Such consent had been given Lark for his previous assignments to the Thomases.

By 1962 the Thomases had stripped all of the coal from their coal-bearing lands that was economically accessible with the equipment they possessed. In May 1962 the Thomases "leased, assigned and conveyed" to the Shawville Coal Company the exclusive right to use the sidetrack and tipple in issue, including the right to use "so much of the Lessors' land surrounding or adjacent to the sidetrack * * * as may be convenient for the Lessee's enjoyment." At the same time the Thomases leased certain coal rights to Shawville in their adjacent coal-bearing lands, subject to the payment of prevailing tonnage royalties which, obviously for tax depreciation benefits, greatly out-dollared rents under the tipple and sidetrack agreement. Both of these agreements were for 3 years with options to renew for an additional 3 years, and in each Shawville could terminate at any time on 30 days' notice. Shawville cancelled both agreements in April 1965 without exercising the renewal options because the leased lands could no longer be economically mined without going deeper than their equipment permitted. Shawville was a large operator with mines elsewhere in the vicinity.

The Thomases did not obtain the Railroad's consent to the tipple and sidetrack assignment to Shawville, although they knew of the requirement and on several previous occasions had made temporary assignments to others after securing the Railroad's consent. The Railroad's local operating personnel, such as the area trainmaster and his subordinates, as well as the Railroad's project engineer for the dam, knew of Shawville's use of the tipple and sidetrack almost throughout the relationship, if they did not know of the assignment itself, and did not inform the Railroad's distant Real Estate Agent or its accounting department who were responsible respectively for leases of Railroad property and for collection of rents thereon. Shawville knew of the requirement for the Railroad's consent to the assignment but did not suggest that it be obtained. Nor did the attorney who prepared it.

The Railroad's Real Estate Agent and its accounting department were not only unaware of the assignment to Shawville, but were even oblivious of the fact that in June 1966 the subject property had been deeded to the United States by the Railroad without mention of a lease encumbrance. They continued to carry the Thomases as lessees following June 1966 and also continued to bill the Thomases for rent until November 1969. Needless to say, at no time did the Railroad ter-

---

2. H. S. Thomas, who died in 1962, was the father of Ansel Thomas and the other plaintiffs herein.

minate the lease and agreement by 30-day written notice as it could have done whenever it wished, without cause. On at least one occasion after the Railroad no longer owned the property it even raised the rent by an endorsement accepted by Ansel Thomas. For reasons which are only speculative Ansel Thomas continued to maintain sidetrack insurance and to pay rent to the Railroad until June 1967 and possibly beyond despite the fact that the siding had been inoperable and unused since October 1964. The circumstances are a mute commentary on the sprawling inefficiency of a railroad so vast that a lease and even a fee title can get lost in the bureaucratic warren.

The last use of the sidetrack and tipple for loading coal was on September 4, 1964. By the end of October 1964 the sidetrack and tipple had become unusable due to the removal by the Railroad, in the course of the track relocation project, of the tracks from the superseded right-of-way and the Railroad's portion of the sidetrack serving the siding. No formal advance notice had been given by the Railroad or the United States to Ansel Thomas of the removal, but notice would have been superfluous since he was conscious at all times of the status of the project and its impending threat to his siding. Between July and October 1965 the United States dismantled, demolished and removed remaining structures from the siding, Ansel Thomas was permitted to salvage betimes anything of value he wished from the tipple, such as the crusher, part of the scales, and his portion of the sidetrack, and presumably did so. By this time he personally considered that his agreement with the Railroad for use of the sidetrack had terminated, although inexplicably he continued to pay rent for several years as stated before.

After the closing of the Ansel Thomas tipple in October 1964 Shawville processed and loaded coal extracted from the plaintiffs' property (until April 1965) and elsewhere through the Jefferson Thomas tipple, which was located within a mile of the superseded tipple and, while it involved a slightly longer haul, approximated the latter's net use charges when certain adjustments were made for services rendered. For example, whereas Shawville paid from 20 to 25 cents per ton to use the Jefferson Thomas tipple as against 3 to 5 cents per ton for the Ansel Thomas tipple, Shawville paid certain maintenance and operation charges at the latter which were included in the other's price, so the net cost of each tended to even up. Suffice it to say that Shawville ostensibly used both of the tipples indiscriminately for loading coal while they were simultaneously available, with emphasis on the Ansel Thomas facility, as though a price difference was inconsequential. If the choice was dictated by respective capacities or other factors it is not shown.

As part of the flood control project the United States provided a new siding along the relocated right-of-way within a mile of the superseded Ansel Thomas tipple. Ansel Thomas expressed interest originally in the new siding but was not offered, and did not request, an undertaking by the Railroad or the Government to move his tipple to the new location at no cost to him, although he could have leased the new siding had he wished, with the moving of his tipple to be optional with him and at his own cost. Nor is there adequate proof of the plaintiffs' assertion that the Railroad offered compensation for the tipple, or that the Government ever intended to move it. For the Railroad to have borne the removal expense would have been inconsistent with its customary policy and with the fact that the tipple was erected at the Thomases' expense in the first place. There was no obligation in fact or law for the Railroad to bear the expense. Thus it is reasonably concluded that Ansel Thomas was interested in leasing the new siding only if the cost of moving his tipple was borne by others. This explains why he made no effort to lease it. By then he was losing interest in being a coal operator other than as a lessor of coal rights and then only to

hire out an occasional coal site or two to meet his bare subsistence needs.

The new siding was opened on a first-come first-served basis in April 1966. Shawville had dickered with the Railroad as early as 1963 over using the new sidetrack and ultimately leased it in June 1966. Thereafter Shawville graded the siding with quantities of fill so that coal dumped there could be conveniently loaded onto railroad cars with a front end loader. Shawville used the new siding as late as 1969 and 1970 when it was loading coal obtained from other lands controlled by Ansel Thomas.

From these facts the plaintiffs contend that a taking occurred on and after September 4, 1964, when the Ansel Thomas sidetrack was rendered unusable, that the taking was compensable even though contrived through a contract between the United States and the Railroad rather than by a conventional physical appropriation by the Government, that the expectancy of renewal of the year-to-year lease should be included in the taking, and that the nature, extent and value of the property taken would be the same whether the taking occurred on September 4, 1964, or thereafter. They also maintain that severance damages are allowable because of the unity of use between the leasehold and the plaintiffs' noncontiguous coal lands and rights. The United States defends on the several grounds that the Railroad's acts in removing the tracks and thus destroying the leased use of the Ansel Thomas siding as well as his tipple are not attributable to the United States, that the leasehold and private sidetrack agreement were of no compensable value to plaintiffs after October 1964 because they had terminated previously, that the plaintiffs are not entitled to a unity of use valuation basis, and that even if there had been a taking the property rights taken were of no value at the time the United States formally exercised dominion over the land in question in June 1966 by acquiring fee title.

The third-party defendants Beech Creek Railroad Company and the Penn Central Company, whose roles in this litigation are explained in footnote 1, defend on the principal ground that under basic landlord and tenant law the plaintiffs divested themselves of their leasehold rights prior to the alleged taking by expiration of the term, and by their covert assignment to Shawville. They also contend that plaintiffs are equitably precluded from any recovery by reason of their tacit participation with Shawville in a scheme to defraud the Railroad.

These various issues were presented to the court at an earlier stage on cross-motions for summary judgment. The court's order of October 22, 1971, denied the motions and returned the case to the Trial Division for findings and conclusions on two issues: whether and when a taking occurred and, if so, whether there was a unity of use between the property alleged to have been taken and the noncontiguous coal lands owned by plaintiffs.

■ A fully dispositive flaw in plaintiffs' case, obviating treatment of other promising candidates,[3] is that by the time of the alleged taking of his lease in September or October 1964 Ansel Thomas had lost his leasehold interest by assigning it to Shawville in May 1962 lock, stock, and barrel. Pennsylvania law governs the issue, for the lease and sidetrack agreement were effected there.

■ A universal rule of landlord and tenant law is expressed in Haynes v. Eagle-Picher Co., 295 F.2d 761, 763 (10th Cir. 1961), cert. denied 369 U.S. 828, 82 S.Ct. 846, 7 L.Ed.2d 794 (1962):

It is well settled that a conveyance by a lessee of an estate less than his own, retaining a reversion, is a sublease, while a conveyance which operates to transfer the entire interest of the lessee is an assignment.

---

3. Factual backing for other issues is nevertheless presented in the Opinion, and in detail in the Findings of Fact following it.

This is the law in Pennsylvania. In re Bayley, 177 F. 522 (W.D.Pa.1909); Girard Trust Co. v. Cosgrove, 270 Pa. 570, 113 A. 741 (1921). The assignment of a lease is the passing of the owner's title to such lease, the legal effect thereof being the same as a sale of the lease. 21 P.L.E., Landlord and Tenant, Sec. 86, citing Goldberg v. Grossman, 105 Pa.Super. 50, 160 A. 138 (1932). After assignment the lessee has no reversionary interest. However, he remains liable to the lessor unless released therefrom by the latter. Gale Industries, Inc. v. Bristol Farmers Mkt. Co., 431 Pa. 464, 246 A.2d 391 (1968). Reservation by the lessee of the right of entry on default, or additional rent charged the assignee, do not detract from the transaction as an assignment rather than a sublease nor constitute retention of a reversionary interest. This is unlike the case of a lessee who does not transfer his whole remaining term but licenses it for 3 months with 3-month renewals subject to termination by the lessee. In that state of facts the court construed a sublease to result because a term less than the lease term was involved. Morrisville Shopping Center v. Sun Ray Drug Co., 381 Pa. 576, 112 A.2d 183 (1955).

Plaintiffs oppose these contentions of the third-party defendants by relying on the terms of the Shawville assignment, particularly a claimed limitation of the scope of the property interest assigned, the provision that improvements made by Shawville were to belong to the Thomases on termination, retention by the Thomases of any condemnation proceeds relating to existing structures on the premises, and the right of reentry on default.

■■■ The May 1962 instrument gave Shawville "the right to the use of so much of the Lessor's land surrounding or adjacent to the sidetrack and the improvements erected thereon or thereby, as may be convenient for the Lessee's enjoyment of the herein leased premises and improvements, and for necessary or convenient extension or additions to the herein leased premises."

The limitation is entirely meaningless, for the determination of what would meet Shawville's "convenience" was in its sole discretion and could encompass the entire property leased by the Railroad to the Thomases. There is no suggestion of a declaration by Shawville as to what its convenience embraced or excluded, or that any portion of the total premises not used by Shawville would be of the slightest utility to the Thomases. A limitation so vaguely expressed is tantamount to no limitation at all. It has been stated that "What is necessary to the enjoyment of the thing demised passes with it, as an appurtenance, without express words, yet, what is merely convenient does not." 21 P.L.E., Landlord and Tenant, Sec. 211 citing Messer v. Rhodes, 3 Brewst. 180 (1870). However, the instrument in the present case expressly transferred the use of such portions of the premises as were convenient to Shawville, without limitation.

The other special features in the Shawville instrument relied on by plaintiffs to rescue the transaction from being regarded as an assignment do not do so because they do not amount to retention of a reversionary interest, which is the hallmark of a sublease. Thus the provision that improvements made by Shawville should belong to the Thomases on termination pertain to structures not *in esse* in May 1962 and, therefore, not part of the premises demised by the Railroad to the Thomases. It was a private arrangement between the Thomases and Shawville concerning the ownership of improvements, just as was the provision confirming the right of the Thomases to retain the proceeds of future condemnation awards relating to their own improvements on the property which, by their lease with the Railroad, belonged to the Thomases and could be removed by them on termination of the lease. Finally, the reservation by the Thomases of the right of reentry on Shawville's default would not constitute retention of a reversionary interest, as held in Ottman v. Nixon-Nirdlinger, 301 Pa. 234, 151 A. 879 (1930).

The petition must be dismissed.