**Jack S. FOSTER et al.**

v.

**The UNITED STATES.**

No. 34–75.

United States Court of Claims.

Oct. 17, 1979.

Charles W. Willey, Santa Barbara, Cal., atty. of record, for plaintiffs.

Gerald S. Fish, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KUNZIG, Judge.

## OPINION

KUNZIG, Judge:

Plaintiffs bring this claim for $4,368,750 plus interest, based on the Fifth Amendment of the Constitution, which declares, in part, "nor shall private property be taken for public use, without just compensation." They argue that as owners of certain mineral rights located on Government property, defendant's denial of access to such property constitutes a compensable taking within the Fifth Amendment. The Government denies that plaintiffs have any interest as claimed, and even if so, that no taking of such an interest has occurred. We hold for plaintiffs.[1]

---

1. Trial Judge Harkin's excellent recommended opinion also held for plaintiffs generally, although we find the taking permanent rather than temporary. The findings of fact are not printed here since those relied upon by the court, and necessary to the result, are contained herein.

The mineral interests which are the subject of the instant case are located in southern California and are part of a tract of land (Tract 83) which was acquired by the United States in the activation of Camp Cooke, now Vandenberg Air Force Base, as an Army facility to train armored and infantry divisions. Activation of Camp Cooke was ordered in mid-1941; land acquisition commenced in September 1941; and defendant acquired an option to purchase Tract 83 on October 29, 1941, for $22,750.

The deed to the United States, dated June 11, 1942, contained the following provision:

EXCEPTING AND RESERVING to grantors, their successors and assigns, the following:

All oil, gas, asphaltum and other hydrocarbon substances and other minerals, including diatomaceous earth, in and under the land hereby conveyed, together with all easements, roads and privileges reasonably necessary to explore said land for, and to produce and transport therefrom, any of said minerals; provided, however, that the rights granted by virtue of this reservation shall not be exercised by grantors for a period of not less than five (5) years from the date hereon or during the present national emergency, whichever period is longer.

Defendant's title to Tract 83 was examined and approved by the Department of Justice. On July 9, 1942, the Attorney General reported to the Secretary of War that valid title was vested in the United States, subject to three described restrictions.[2] The Attorney General noted the Army had advised that the mineral reservation and rights incident thereto "will not interfere with the contemplated use of the land." The mineral rights reserved in Tract 83 could not be exercised for a period of not less than five years, or during the national emergency (now expired) then in effect.

At the time of the sale to the United States, the predecessors in interest to plaintiffs (the McClellans) were aware of the fact that Tract 83 contained various rock deposits that could have substantial commercial value. The McClellans, however, made no attempt during the time they owned the mineral rights in question to ascertain the composition or nature of such deposits.

No interest was shown, by either the McClellans or defendant, in exploring the mineral deposits on Tract 83 until 1969. In that year due to several requests to enter Tract 83 to extract various minerals thereon by private contractors and state officials, Headquarters at Vandenberg Air Force Base sought advice from the Chief of the Real Estate Division, Los Angeles District, United States Corps of Engineers, concerning the right to refuse entry to holders of mineral rights such as those reserved on Tract 83. In response to this request, Vandenberg was advised that "sand and gravel, as reserved in a deed, were not minerals," and, therefore, it assumed that "with regard to Tract 83, the government has the exclusive right to explore for and to remove sand, gravel, limestone, clay, and similar substances." Vandenberg was further advised that the grantors (the McClellans) of Tract 83 had no right to quarry stone, or to authorize contractors to quarry stone, on Tract 83 "as the right is exclusive to the Government."

On July 8, 1971, plaintiffs in the instant action acquired a real property interest in Tract 83 through a lease executed by C. M. McClellan as lessor and James and Virginia Mosby as lessee. Prior to the acquisition of this lease, James H. Mosby and Jack S. Foster had entered into an oral joint venture agreement for the acquisition of a mineral interest in Tract 83.[3]

2. Such restrictions were:

(1) Easements for roads, highways and public utilities.

(2) [Restriction on manufacture of liquor on the premises.]

(3) The mineral reservation which is the subject of the instant case and which is set out in full, *supra*.

3. For convenience, the term "plaintiffs" refers to the joint venture formed by Foster and Mosby. Virginia E. Mosby and Charlotte Patricia

The lease only permitted quarrying for riprap.[4] It provided:

> Lessee shall have the right to extract and remove and take from the premises all rip rap rock and this lease does not include sa[n]d, gravel, diatomaceous material or petroleum products.

The lease had a five-year term (June 1, 1971 through May 31, 1976), renewable at lessee's option for an additional five-year term; an annual rental of $300, payable on June 1; and a supplemental monthly payment of 25 cents per ton of rock removed. Time was declared to be of the essence. Title to any rock removed from its natural state would "remain in the Lessor" until removed from the premises. The lease extended to, and inured to the benefit of the "heirs, legal representatives, successors, and assigns of the Lessor and the Lessee."

On November 3, 1971, James Mosby telephoned the Chief of the Acquisition Branch, Real Estate Division, Los Angeles District Engineers, to ask about permission "to remove a rock known as Dol[o]mite" under the lease. The dolomite was said to be urgently needed for construction on Highway 101. In this conversation, Mosby was advised that previous requests for access to the same land had been rejected.

Permission to survey and drill test the dolomite deposit for riprap rock was requested formally on November 4, 1971, in a letter that stated a local highway project on Highway 101 (the Rincon project) needed a large quantity of 12-ton rock before the coming winter storms. Permission was denied in a letter dated November 18, 1971, on the ground that dolomite was not a mineral within the meaning of the reservation in the deed "because it is desired for use as rock and not for the extraction of any minerals therefrom."

Plaintiffs' request for permission under the lease to extract dolomite for use as riprap rock was reiterated in a letter dated November 19, 1971. This letter pointed out that dolomite has a definite chemical composition and that the subject deposit could be quarried for 12-ton size rocks for use as riprap. Plaintiffs claimed they had an oral contract with Green Construction Company (Green) to supply a minimum of 50,000 tons of dolomite riprap rock for use on the Rincon project at a price of $4 per ton. Plaintiffs emphasized that continued denial of access to the dolomite deposits would jeopardize the contract with Green and lead to legal action for "damages in inverse condemnation for the governmental taking of the entire dolomite deposit on this property."

Although there was no direct response to plaintiffs' November 19, 1971 letter, in response to a further inquiry by Representative Charles M. Teague, Member, United States Congress, defendant explained on January 27, 1972, that access under the McClellan lease had been denied because dolomite, when it was intended to be used as riprap, was not considered to be included in the phrase "other minerals" in the rights reserved in the deed.

After defendant denied access under the lease to quarry dolomite for use as riprap, plaintiffs purchased all of the mineral rights the McClellans had reserved on Tract 83. By deed dated May 2, 1972, plaintiffs acquired a grant of the following real property in Tract 83:

> All oil, gas, asphaltum and other hydrocarbon substances and other minerals, including diatomaceous earth, in and under the land described below, together with all easements, roads, and privileges rea-

Foster are co-plaintiffs by reason of their legal ownership of a real property interest; neither participated in negotiations for, nor purchase of, the lease or the property. The lease was taken in the names of the Mosbys for convenience, and the Fosters functioned as co-lessees, with C. M. McClellan's approval as lessor.

**4.** Riprap consists of heavy, irregular rock chunks which are used chiefly for river and harbor work, such as spillways at dams, shore protection, docks, and other similar construction that must resist the force of waves, tides, or strong currents, and is also used to fill in roadways and or embankments. Bureau of Mines, *A Dictionary of Mining, Mineral, and Related Terms* 929 (1968) (hereinafter cited as *Dictionary of Mining Terms*).

sonably necessary to explore said land for, and to produce and transport therefrom any of said minerals.

Plaintiffs purchased this property for $5,000, a price which was established by the McClellans. At the time plaintiffs purchased this reserved mineral interest, they knew that the United States claimed ownership to the dolomite deposit.

On April 12, 1974, plaintiffs reasserted a right to quarry and produce dolomite from the deposits on Tract 83. Plaintiffs reviewed previous correspondence, declared that site investigation by a geologist had disclosed that the dolomite deposit was ideally suited for economic and profitable extraction as riprap, and asserted "it is not the dolomite mineral as such which is profitable to extract, but the dolomite rock as it exists in its natural state."

Defendant's response, dated October 29, 1974, concluded that plaintiffs, as assignees of all of the rights retained by the McClellans, did not acquire any right to remove dolomite rock because the dolomite deposit was not a mineral within the scope of the reservation clause. Furthermore, they responded that the anti-assignment statute barred [5] from asserting this claim against the Government. Plaintiffs were denied access to the Tract 83 dolomite deposit on the ground that title to the deposit had vested in the United States in the original 1942 deed. Plaintiffs thereafter timely brought suit in this court in February 1975.

## I.

The dispute in this case is limited to the right of plaintiffs to quarry and remove dolomite rock from two deposits on Tract 83. The Government does not contest plaintiffs' right under the terms of the 1942 deed to Tract 83 to explore for and remove all oil, gas, asphaltum and other hydrocarbon substances. Rather, the Government asserts that the phrase "and other minerals" contained in the deed does not include dolomite. As such, plaintiffs have no vested right that the Government has violated.

As an alternative ground, defendant argues that, even if dolomite is a mineral within the meaning of the 1942 deed, the actions of Government officials in denying plaintiffs access to Tract 83 did not constitute a taking of plaintiffs' property interests demanding just compensation to be paid under the Fifth Amendment.[6]

Plaintiffs argue that the phrase "and other minerals" employed in the 1942 deed is to be interpreted under well-established principles to construe reservations in deeds in favor of the grantor. As such, dolomite is included in the phrase "and other minerals," as intended by the parties to the deed. The failure to enumerate specifically dolomite as a reserved mineral under the deed, plaintiffs argue, is of no avail to defendant, since it is common practice to employ the phrase "other minerals" to reserve all substances which can be extracted from the land to

---

**5.** 31 U.S.C. § 203 (1976). *See* note 6 *infra* for discussion of defendant's claim.

**6.** Defendant originally argued that the Anti-Assignment Act [31 U.S.C. § 203 (1976)] barred any claim by plaintiffs. Now, however, the Government admits that a claim under the lease is valid but argues that the Act bars any claims based on the acquisition of the McClellan's entire interest in 1972. Since this court finds defendant's actions constituted a permanent taking, *infra*, it is important to show the inapplicability of defendant's argument.

The purpose of the Anti-Assignment Act was to prevent politically influential people from improperly trafficking in claims against the Government, to avoid multiple litigation, and to protect defenses the United States may have against the assignor by way of setoffs or counterclaim. *See Patterson v. United States*, 354

F.2d 327, 329, 173 Ct.Cl. 819, 822–23 (1965). No claim arose in regard to Tract 83 until November 18, 1971, long after plaintiffs acquired a leasehold interest. Thus, as defendant concedes, the Act does not bar any claim on the leasehold. The subsequent purchase of the entire interest in the mineral reservation was not the acquisition or "trafficking" of a claim covered by the Act but, rather, the perfection of the pre-existing interest in the land and claim against the Government. Furthermore, when the mineral reservation includes grantors, successors and assigns, a subsequent transfer of the mineral right is not barred by the Act. *United States v. Jordan*, 186 F.2d 803, 807–08 (6th Cir. 1951) ("successor and assigns" to timberland not barred by anti-assignment statute).

yield value. Based on the foregoing, plaintiffs contend that since they had a vested right in the dolomite deposits on Tract 83 and were refused access to such deposits by defendant, they are entitled to be compensated for such interests in accordance with the Fifth Amendment.

We agree.

■ It is well established that in determining the nature of property rights created by a conveyance (here the 1942 deed) both this court and other federal courts have applied the law of the situs of the real property involved. *See, e. g., Thomas v. United States,* 505 F.2d 1282, 205 Ct.Cl. 623 (1974); *Johnson v. United States,* 479 F.2d 1383, 202 Ct.Cl. 405 (1973); *Coos County Sheep Co. v. United States,* 331 F.2d 456 (9th Cir. 1964). Moreover, when the United States contracts to acquire or in fact acquires real property within a particular state, the laws of that state control what rights arise in the United States therefrom. *United States v. Fallbrook Public Utility District,* 165 F.Supp. 806 (S.D.Cal.1958); Restatement Second of Conflicts Section 223 (1971). On this basis, we turn to applicable California law to aid in the interpretation and construction of the 1942 deed.

The general custom and practice in the real estate and title insurance industries in southern California is that mineral reservations in deeds normally do not delineate specific minerals to be included in the reservation; rather, the phrase "other minerals" is used to encompass any mineral which can be extracted from the land to yield value. Indeed, the Government's own witness conceded that if, in drafting a deed, a grantor wanted to reserve all minerals that were present, the grantor would simply employ the phrase "other minerals."

Moreover, the California Civil Code specifically provides that reservations in a grant (deed) are to be interpreted in favor of the grantor. Cal.Civ.Code § 1069 (West 1973); *Deterding v. United States,* 69 F.Supp. 214, 107 Ct.Cl. 656 (1947); *People v. Ward,* 258 Cal.App.2d 15, 65 Cal.Rptr. 508 (1968). Additionally, California law provides that a deed, like a contract, should be interpreted so "as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal.Civ.Code § 1636 (West 1973); *Paddock v. Vasquez,* 122 Cal.App.2d 396, 265 P.2d 121 (1953) (mineral deed); *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968) (extrinsic evidence allowed to interpret writings in accord with parties' intent).

■ The intention of the grantors, the McClellans, was clearly established at trial. They were aware that sedimentary and ocean-borne deposits could have substantial value and that other prior rock quarries located in the vicinity had been commercially valuable. The specific deposits here in question were known by the McClellans to exist at the time of the 1942 conveyance to the United States since portions of the deposit then were and still are physically visible at the surface of the earth. The phrase "other minerals," as used in the reservation clause in the 1942 deed was specifically intended by the McClellans to reserve to themselves and to their successors and assigns not only the ownership of all hydrocarbon substances and all metallic ores, but also the ownership of any rock deposit which could be profitably extracted from the ground for any kind of commercial use. The intention to reserve rock as a part of the mineral estate was not limited to rock which was useable only in refined or processed form, or was useable only by reason of its chemical or physical properties, but also extended to and included rock which is used in its raw form, *qua* rock, for construction and riprap purposes. The McClellans understood the potential value of extractable material and therefore reserved the entire mineral estate for the purpose of exploring and developing the estate should it ever become economically feasible to do so.

We therefore are compelled to conclude that the phrase "and other minerals" was intended to include other such minerals that may in the future be discovered and exploited on Tract 83, whether or not such minerals were specifically enumerated in the deed.

The question remains, however, as to whether dolomite qualifies as a "mineral" as that term is used in a scientific and geologic sense.

■ Evidence adduced at trial indicated that the term "mineral" denotes a naturally occurring solid having a chemical composition that varies only within pre-established, fixed limits. *See, e. g., Cumberland Mineral Co. v. United States,* 513 F.2d 1399, 206 Ct.Cl. 797 (1975). Additionally, a mineral is almost always crystalline in structure.[7] The record before us is clear that dolomite falls within the above description and thus qualifies as a "mineral" as that term is generally used.

While California law governs the interpretation of the deed and lease here in issue, *Thomas v. United States,* 505 F.2d 1282, 205 Ct.Cl. 623 (1974); *United States v. Fallbrook Public Utility District,* 165 F.Supp. 806 (S.D.Cal.1958), that law accords with this court's admonition that in "construing mineral reservations and conveyances, 'each determination must be made in the light of the language of the particular instrument together with the circumstances and conditions existing at the time.'" *Cumberland Mineral Co. v. United States, supra* 513 F.2d at 1401, 206 Ct.Cl. at 803, quoting, *Dierks Lumber & Coal Co. v. Meyer,* 85 F.Supp. 157, 162 (W.D.Ark.1949). *Compare Palos Verdes Corp. v. Housing Authority,* 202 Cal.App.2d 827, 21 Cal.Rptr. 225 (1962). As discussed earlier, at the time the deed was executed, the grantors (the McClellans) were specifically aware of the presence of dolomite and its potential commercial viability.

The other language of the deed confirms this conclusion. The reservation included "other materials, including diatomaceous earth, in and under the land hereby conveyed * * *." This definition of mineral to include diatomaceous earth strongly suggests that the grantors broadly intended the reservation to cover almost any substance that would be valuable if extracted.

Indeed, if diatomaceous earth is a mineral, it is difficult to understand why dolomite also is not one.

In summary, we hold that (1) the reservation in the 1942 deed was intended to include minerals not specifically enumerated in the deed as found on Tract 83 and (2) dolomite is a mineral as that term is scientifically defined and as intended by the parties.

## II.

The crux of plaintiffs' claim is that defendant's continued refusal of access to the dolomite deposits constituted a taking within the Fifth Amendment for which they are entitled to compensation. The trial judge found that a temporary taking occurred on November 18, 1971, and awarded plaintiffs $23,250 plus interest. We agree that defendant's actions constituted a taking as of November 18, 1971, but consider it a *permanent* taking.

■ Initially, we note that plaintiffs' leasehold interest in the reserved mineral rights is compensable. As an estate in real property, the Government must compensate for any taking. *Almota Farmers Elev. & Whse. Co. v. United States,* 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); *United States v. 237,500 Acres of Land,* 236 F.Supp. 44 (S.D.Cal.1964).

The case at hand does not present the "normal" inverse condemnation situation arising from unreasonable governmental regulation. *See Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1972). Nor is the Government's action here quite the "normal" repeated action which again and again physically intrudes upon a plaintiff's property. *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (recurring floodings); *Barnes v. United States,* 538 F.2d 865, 210 Ct.Cl. 467 (1976). Rather, the Government is in rightful possession of Tract 83, but is totally denying plaintiffs access to those

---

7. For instance mercury, while classified as a mineral appears frequently in a liquid, non-crystalline form. Thus, the crystalline nature is not controlling, but highly indicative of the dolomite's characterization. See *A Dictionary of Mining Terms, supra* note 4 at 710.

minerals, e. g., dolomite, to which they have a right. Denying access 100% of the time.

 Generally, the Fifth Amendment requires the Government to have intended to take property before compensation is required. *Sun Oil Co. v. United States,* 572 F.2d 786, 818, 215 Ct.Cl. 716, 770 (1978). That intent, however, can be implied from the facts. *Id.* Thus, in inverse condemnation cases such as this, the ultimate test is whether the Government action is such that it "deprives the owner of all or most of his interest in his property." *Aris Gloves, Inc. v. United States,* 420 F.2d 1386, 1391, 190 Ct.Cl. 367, 374 (1970). As this court has stated, "The question of whether there is a fifth amendment taking cannot turn simply on general principles of law; it must be based on the particular circumstances of each case." *Id.* at 420 F.2d at 1391, 190 Ct.Cl. at 375. And the facts here are unusual.

 The Government's actions in this case, in essence, constitute a series of incremental denials sufficient to constitute a permanent taking. *See United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1945). As early as 1969, prior to plaintiffs' acquiring their interest, the Government began asserting that the owners of reserved mineral rights had no legal rights to dolomite on Tract 83. Plaintiff James Mosby was advised orally on November 3, 1971, that permission to remove dolomite would be denied. Then on November 18, 1971, permission was formally denied after Mosby's further request. When Congressman Charles Teague inquired, he also received notice that access would be denied to plaintiffs.

The record shows repeated requests for permission to enter and accompanying denials of permission by the Government. The situation is similar to that faced by this court in *Benenson v. United States,* 548 F.2d 939, 212 Ct.Cl. 375 (1977). While *Benenson* concerned overly extensive governmental regulation which resulted in a taking of the Willard Hotel in Washington, D.C., its principles are apt. In that case, plaintiffs were deprived of any commercial-ly feasible use of their property by the vacillation of the Government which neither condemned the hotel nor allowed any development of that property. As then Chief Judge Cowen stated in his forceful opinion in *Benenson,* "[T]he Government's interference with the owner's use of his property may be so substantial and burdensome that a constitutional taking is implied." *Id.* 548 F.2d at 947, 212 Ct.Cl. at 388. The same type of situation is present here with the Government denying plaintiffs use of their mineral rights yet not condemning those property interests.

Obviously the Government may well have legal condemnation rights, but the condemnation process was never even broached with plaintiffs. Condemnation is not at issue in this case.

Our holding in the instant case is further bolstered by the United States Supreme Court's decision in *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950). There, the Government operation of the Friant Dam resulted in the deprivation of plaintiff's riparian rights to spring flooding of pasturage. That seizing of plaintiff's springtime high water was deemed the withholding of a property right and compensable. Similarly, the Government here has taken plaintiffs' mineral rights by withholding access to the deposits.

As a practical matter, the Government cannot allow plaintiffs to mine for dolomite on Vandenburg Air Force Base and continued denial of access for that purpose is certain. In order to quarry the dolomite, plaintiffs would require the use of military reservation roads to which defendant has indicated that no access would be allowed due to its detrimental impact on base operations. The Government has taken this position despite the 1942 deed's explicit reservation of necessary privileges on roads and retention of easements. Furthermore, blasting operations would interfere with missile tracking radar systems, operation of the control station and Vandenburg's reservoir, and create hazards in missile launching operations.

In effect, the use of Tract 83 as a part of an air force base is incompatible with its use as a dolomite quarry.

■ In sum, we conclude that the permanent taking of plaintiffs' property interest in Tract 83 *vis a vis* the right to quarry and remove dolomite occurred on November 18, 1971,[8] for which plaintiffs are entitled to be compensated.

■ Finally, the issue of damages must be addressed. The trial judge, in his recommended opinion, found only a *temporary* taking of plaintiffs' mineral rights as opposed to our decision today that such rights were *permanently* abrogated by defendant. We are, therefore, constrained to remand this issue to our Trial Division for ascertainment of plaintiffs' damages based on the permanent deprivation of plaintiffs' interests. Our holding that plaintiffs are entitled to recover for a permanent taking of their mineral interests is not an intimation that any one method employed by any of plaintiffs' or defendant's experts for the purpose of determining just compensation has been adopted or approved by the court. We agree with the trial judge that the value of plaintiffs' entire mineral interest was, in the absence of comparable sales, the fair market value of the minerals in place on the date of the taking. This value is to be determined by the trial judge on the basis of evidence that already has been produced by the parties, plus any relevant, non-cumulative additional evidence which either party may desire to offer.

## CONCLUSION OF LAW

Upon the foregoing opinion and findings herein, the court concludes as a matter of law that plaintiffs are entitled to recover and judgment is entered to that effect. The determination of the exact amount of recovery is to be made in further proceedings under Rule 131(c).

**8.** The trial judge found, and we agree, that defendant's formal refusal by letter was the date of the taking. This finding agrees with the principle that property is deemed taken when the Government substantially disturbs the owner's use and possession of the subject property. *United States v. General Motors Corp.,* 323

U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *R. J. Widen Co. v. United States,* 357 F.2d 988, 993, 174 Ct.Cl. 1020, 1027–28 (1966). *See also, United States v. Welch,* 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787 (1910) (denial of access may be a taking).