UNITED STATES of America,
Plaintiff-Appellee,

v.

1,606.00 ACRES OF LAND, More or Less, SITUATED IN TEXAS COUNTY, STATE OF OKLAHOMA; the Commissioners of the Land Office of the State of Oklahoma; First National Bank of Amarillo and Carol Sharon Thompson, Coexecutors for Henry Thompson, Dec'd; Colleen Hamilton, single; Ruth Jacobs, single; Donita Ford, single; Lloyd McCants, Jr.; George McCants; Robert L. Lyler, single; Joyce Oyler Grace; Janet Kesterson, single; and unknown others, Defendants,

Julia F. Barbee; Shriner's Hospital for Crippled Children; First National Bank—Gilmore Partnership Account; Lona N. Graham, Rosalie Gilmore Shelton, Lewis Mayer, Wylie B. Beasley, Deceased; Prentis S. Beasley, aka Prentice S. Beasley; Grace Robertson Oiler Jessup; Waneta Rider; William Arthur Enz, and Robert Eugene Enz, Defendants-Appellants.

No. 81–1360.

United States Court of Appeals, Tenth Circuit.

Jan. 18, 1983.

Kathleen P. Dewey, Atty., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Larry D. Patton, U.S. Atty., John E. Green, Asst. U.S. Atty., Oklahoma City, Okl., Dirk D. Snel and Laura Frossard, Attys., Dept. of Justice, Washington, D.C., on the brief), for plaintiff-appellee.

Robert W. Pittman, Oklahoma City, Okl., for defendants-appellants.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The United States here instituted an action in the nature of a condemnation pro-

ceeding in which it sought to subordinate all oil, gas and other mineral rights in four tracts of land with the right of the United States to flood the tracts as necessary for the construction or operation of the Optima Lake project in Texas County, Oklahoma. The estates taken are described in the government's Declaration of Taking set out below.[1] Natural gas was being produced from each of the four tracts on the date of the taking. The appellants also owned the mineral rights to the tracts' non-producing minerals.

The district court appointed a condemnation commission pursuant to Rule 71A(h) of the Federal Rules of Civil Procedure to determine the issue of just compensation. The mineral owners and the government presented evidence as to the compensation which might be due the mineral owners but much of this evidence consisted of expert testimony as to the value of the producing and non-producing minerals as of the date of the filing of the suit and the difference in value as a result of the actions of the government.

The commission filed its report on August 27, 1979. It found no evidence that the United States intended to plug the existing · wells, or that all producing reserves could not be recovered. It adopted nominal compensation figures for the subordination of the producing minerals. The commissioners awarded total damages to the producing minerals as follows:

| | |
|---|---|
| Tract 132 Mineral Easement (hereinafter "ME") | of $1000 |
| Tract 211ME | of $1500 |
| Tract 212ME | of $2100 |
| Tract 338ME | of $2000 |

1. The subordination of all oil, gas and other minerals in and under Tract Nos. 132ME, 211ME, 212ME and 338ME, and all appurtenant rights used in connection with the exploration, development, production, and removal of said oil, gas and other minerals, including any existing structures and improvements, to the prior right of the United States to flood and submerge the land as may be necessary in the construction, operation and maintenance of the projects; provided further that any exploration or development of said oil, gas and other min-

The award was made with respect to the non-producing minerals as follows:

| | |
|---|---|
| Tract 132ME | $14,926 |
| Tract 211ME | $14,091 |
| Tract 212ME | $ 4,050 |
| Tract 338ME | $25,750 |

The mineral owners filed objections to the commission's report. The district court upheld the commission's findings and entered final judgment for each Tract on March 10, 1980.

## SUMMARY OF THE EVIDENCE

The appellant, Commissioners of the Land Office of Oklahoma, called two witnesses. One was *C. Fred Morton* who testified as to the value of the minerals in producing wells which had not been recovered as of the date of the taking.

The Land Office also called *Mr. Robert Shipman.* Mr. Shipman testified that the value of the non-producing minerals as of the date of the taking was $100 per acre. He said that he had multiplied the bonus value per acre in 1977, which was $50.00 per acre, by 3 and obtained $150.00 per acre and that he took $50.00 off because of the producing zone, and arrived at a value of the non-producing minerals as of the date of taking as $100 per acre. His conclusion was that the award for the non-producing minerals should be $90.00 per acre.

The individual defendant royalty owners called four witnesses. The testimony of three of them was considered by the commissioners as their opinion.

*Edmund H. Benton* gave extensive testimony regarding the royalty interests, using an exhibit admitted into evidence. He described the exhibit as representing "com-

erals in and under said land shall be subject to Federal and State laws with respect to pollution of waters of the reservoir, and provided that the type and location of any structure, improvement, and appurtenance thereto now existing or to be erected or constructed on said land in connection with the exploration and/or development of said oil, gas and other minerals shall be subject to the prior written approval of the District Engineer, Tulsa District, Corps of Engineers, Tulsa, Oklahoma, or his authorized representative.

puter simulations of the various present worths of the royalty interests under ... five wells depending upon certain price conditions of price for the products." Benton testified that the non-producing horizons under some of the land would be more valuable than the producing horizons for the reason that there is a great unknown as to the quantities of reserves to be found in the other horizons which have produced already at suppressed prices and the new horizons would be at new prices being allowed at the time and therefore would have sufficiently greater present worth than the existing zones.

*Bobby Darnell* was called by the royalty owners. He testified that he had been purchasing leases and blocks of leases and buying royalties since 1966. He was of the opinion that there was a probability of producing in the non-producing zones considered in this action. Today minerals in Oklahoma had a minimum value of $250 per acre depending on where they are developed. He testified that the value of the non-producing minerals under the tracts here were somewhere between $250 and $550 per acre. He said he had no opinion as to the value of the minerals after the date of taking, but that his opinion was as to their value before the taking. He also said that he "wouldn't want to mess with the Federal Government" and therefore to him they wouldn't be worth anything with the easement.

*Lewis Mayer,* a royalty holder, also testified. But his testimony pertained to a comparable sale of minerals.

The United States introduced many exhibits and called only one witness. That was *Gordon L. Romine,* who testified as an expert on the side of the United States. He said he had appraised the four tracts in question and the non-producing ones and had made appraisals of all of the interests. He detailed the complex steps that he had taken in making the appraisals. His conclusion was that the possibility of production from non-producing zones were not favorable and were speculative and that production was occurring in other similar areas

and was limited. He also pointed out that several dry holes in the area had been drilled by knowledgeable operators. He stated that production in zones where dry holes were drilled would be highly speculative. He estimated values of the non-producing minerals in three of the four tracts was $30.00 per acre and the fourth was $60.00 per acre. He stated that the fourth tract was valued higher due to the fact that no deep tests had yet been conducted there. He reached this conclusion as a result of talking to property owners and based on, among other things, comparable sales. Mr. Romine's testimony was quite extensive and in large part consisted of supporting information. For example he testified that all existing wells had been rehabilitated with dikes so as to keep them above flood water and that it would therefore be possible to recover the reserves from all producing wells, suffering only a moderate loss of recovery. He later stated that the producing wells could produce all remaining reserves under then existing conditions.

He further testified that all of the tracts in this action could be directionally drilled from points outside the reservoir and not require permission from the Tulsa District to do so. He did admit, however, on cross examination that directional drilling is more expensive than straight hole drilling. He estimated the losses for non-producing zones to be as follows. This is presented in a table prepared by the commission:

| Tract 132 | – | 34% loss |
|-----------|---|----------|
| Tract 211 | – | 33% loss |
| Tract 212 | – | 18% loss |
| Tract 338 | – | 25% loss |

Finally Mr. Romine testified that he understood that the Corps of Engineers would give permission to drill new wells in this area so long as the reservoir was not polluted and spacing rules were complied with. Romine stated that the sale testified to earlier by Mr. Mayer involved minerals twenty miles west and north of the four tracts in this cause. His mention that the Corps of Engineers would give permission brings to mind the fact that this factor certainly is on the liability side and the

average buyer would hesitate to purchase based upon the fact that permission of the government would have to be obtained in order to carry out a drilling program.

█ The contention of the appellants is that the broad wording of the taking gives the government the right to plug producing wells and control or prohibit development of non-producing minerals. On the matter of plugging, we do not pass on this as an element in the case because there is 'no assurance that there will be plugging of the wells. And so it is speculation. If indeed the government plugs the producing wells the plaintiffs would be free to seek recovery for interfering with the important sticks in their bundle of rights. Appellants argue that the commissioners' award of nominal damages as to the producing wells and for only a portion of the undeveloped minerals was not just compensation. They urge also that the commission and the district court erred by not considering appellants' evidence as to the extent of the taking and its failure to weigh the government's acquisition of the right to require the plugging of the producing wells and to control of or prohibition of further development under said taking.

The appellants have offered evidence of a condemnation report from another case which was not admitted into evidence. However the issue whether it was error to exclude it was not briefed and it is questionable whether this is an issue here. Also, inasmuch as the admission of evidence is a discretionary decision of the trial court and since there is no indication that the rejection of this evidence was an abuse of this standard, need not be considered. *See Texas Eastern Transmission v. Marine Office-Appleton & Cox Corp.*, 579 F.2d 561 (10th Cir.1978).

## DISCUSSION OF THE APPLICABLE LAW

In the trial court's charge to the commission it stated:

If an easement, or interest in the nature of an easement, is being imposed upon the whole unit (or on a remainder), your award must be determined by first ascertaining the fair market value of the whole unit as of the date of taking, and then subtracting from that amount the fair market value of the whole unit (or remainder), as the case may be, with such easement, or interest in the nature of an easement, imposed thereon.

The trial court further charged:

You must make an entirely separate determination of the fair market value of the remainder (part not taken) by use of the same principles that guided you in determining the fair market value of the whole unit. You should determine the fair market value of a remainder on the date of taking just as if it had never been a part of the whole unit.

█ It is well established that a commissioner's findings are not to be disturbed unless they are found to be clearly erroneous. *United States v. 494.10 Acres of Land in Cowley County*, 592 F.2d 1130 (10th Cir. 1979); *United States v. 46,672.96 Acres of Land, More or Less, in Dona Ana, et al, Counties*, 521 F.2d 13 (10th Cir.1975); *United States v. Brinker*, 413 F.2d 733 (10th Cir.1969). Thus this court will not reweigh the evidence or, stated differently, will not retry the case. Thus, commission findings derived from conflicting evidence we regard as binding on the court. *United States v. 494.10 Acres, supra, United States v. Brinker, supra.*

█ We regard the commission's award of nominal damages to the mineral interest owners growing out of the subordination of the owners' right to produce minerals to be supported by substantial evidence presented at the hearing. However, the United States did not ask in its condemnation petition for the right to plug producing wells. There is no evidence in the record to the effect the government has requested or will request the plugging of any existing wells. This does not mean that the government will not seek to do so but should they wish to plug existing wells, it would seem that they must assert the right specifically.

The record does contain evidence of projected recoverable reserves on existing wells and prices which may be expected to be paid for these reserves under producing zones. Mr. Morton, who testified on behalf of appellant Land Office, admitted that all reserves on two of the four tracts could be recovered if the condition of the wells remained the same as of the date of the taking. Mr. Romine, who testified for the government, said that steps had been taken to rehabilitate all producing wells with dikes to keep them above flood water. He concluded that all reserves could be completely recovered from producing wells. Based on this the commission concluded that there was little damage to the right to recover this oil and it awarded only nominal damages for producing minerals and the evidence does support this result.

But a good deal of conflicting evidence having to do with the compensation due mineral royalty owners for the subrogation of the non-producing minerals to the United States to flood was presented. After review of the transcript and exhibits presented to the commissioners, there appears to be adequate compensation awards as to the non-producing minerals.

Mr. Shipman testified that the average bonus paid for mineral leases in the year 1976 was $55.22 and that this figure would continue to rise. He said that the minerals were worth 2 and ½ times to 3 times the last bonus paid for minerals. He called attention to the formula which he employed above in reaching the conclusion that the subordination reduced the value of the minerals by 90%. The commission adopted Shipman's testimony as to the values of the non-producing minerals (at the time of the taking) but not as to the reduction in value as a result of the taking. It adopted Mr. Romine's testimony as to loss of value as a result of the subordination. The exact reduction amounts are in the table presented above. The conclusions of the commission were made based upon conflicting testimony. They are not unsupported. We emphasize that we are not fact finders here.

The Court of Appeals for the Fifth Circuit faced the same kind of problem in *Seale v. United States,* 243 F.2d 145 (5th Cir.1957). There the government in eminent domain proceedings took a right to flood lands under which appellants held mineral rights. The trial court, sitting without a jury, awarded nominal damages to the mineral royalty owners. It found that this was full compensation for the right to flood the lands. Appellants there argued that this finding was clearly erroneous pointing to their witnesses' testimony that the taking of the mineral acres for flooding substantially decreased the value of the mineral rights. The government, however, argued that the right to flood had not affected the value of the reserved mineral interests and that the district court's finding was within the scope of the evidence. In affirming the award of nominal damages the court said that, after referring to the fact that the appellants were disappointed, the opinion testimony of their witnesses was not considered. The court of appeals in a per curiam opinion said in part:

> We, ourselves, find it difficult to determine just how the district judge arrived at the figure of two dollars per acre fixed by him as just compensation when [the appellants'] witnesses fixed the loss of value at from twelve to thirteen dollars per acre and the government's witness said there was no loss of value.

243 F.2d at 146. We call attention to the fact that this finding was much more in line with the evidence than is the finding in this case. The court continued:

> It is not, however, required that we agree with his findings. It is sufficient for us that we cannot, upon the evidence as a whole, determine that the finding was clearly erroneous as not within the evidence, and that, since we cannot do so, we may not interfere with the finding or with the judgment based on it.

Id. (citations omitted). As the opinion shows the appellate court upheld the district court in a case not dissimilar to the present one regardless of the fact that the evidence was apparently substantially in favor of the appellants-mineral owners. In

this case the commission paid close attention to the evidence and also to the instructions given by the trial court.

Appellants contend that the powers that the United States Corps of Engineers can exercise, including having to obtain prior approval to mine from the Corps of Engineers, should entitle them to full compensation. We have already called attention to the fact that unlitigated future taking of property is subject to further litigation.

 Possible future taking of property cannot give rise to a present action for damages. *See United States v. 3,218.9 Acres of Land,* 619 F.2d 288 (3rd Cir.1980). Moreover a threat to condemn one's property does not constitute a taking. *See Hempstead Warehouse Corp. v. United States,* 98 F.Supp. 572, 120 Ct.Cl. 291 (1951). *See United States v. 3,218.9 Acres, supra,* wherein appellants owned underlying mineral interests in land which was acquired by the government for national forest. The Declaration of Taking stated the government took the estate in fee simple subject to, among other things, the reservation of mineral interest owners to enter and remove the minerals "in accordance with the rules and regulations of the Secretary of Agriculture." *See United States v. 3,218.9 Acres, supra* at 290. The mineral owners argued that the possibility that the Secretary's rules could inhibit the removal of the minerals in the future provided a present basis for damages. The court held that the effect of these rules, if any, did not amount to a taking and no present cause of action should lie. The requirement in the Declaration of Taking here is that prior approval must be secured by the United States, and the right of the United States to flood, similarly does not give appellants an automatic right to full compensation. *Cf. Foster v. United States,* 607 F.2d 943, 221 Ct.Cl. 412 (1979) wherein the court of claims held that where the government repeatedly refused to allow the mineral interest owners access onto condemned land to mine minerals reserved to them in the government's Declaration of Taking, the mineral owners were subject to a permanent taking by the government. In our case appellants have reserved the right to develop their minerals. If the government were prohibiting their access, they might be able to contend that they were entitled to full compensation, as in *Foster.*

In summary it is our opinion that the correct legal standards were brought to bear in the case and that the developed facts supported the findings and conclusions of the commission and were adopted by the district court. Furthermore it cannot be said that the findings are clearly erroneous. There is ample evidence on both sides of each issue.

Accordingly the judgment of the district court is affirmed.