JAMES MOSBY AND VIRGINIA MOSBY, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JACK S. FOSTER AND PATRICIA FOSTER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 24519-83, 24534-83.    Filed February 14, 1986.

*Charles W. Willey*, for the petitioners.
*Elaine T. Fuller*, for the respondent.

OPINION

COHEN, *Judge*: Respondent determined the following deficiencies in petitioners' income taxes:

| Name | Docket No. | Year | Deficiencies |
| --- | --- | --- | --- |
| Mosby | 24519-83 | 1977 | $13,104 |
| | | 1978 | 1,240 |
| | | 1979 | 4,774 |
| Foster | 24534-83 | 1978 | 6,033 |
| | | 1979 | 417 |

The sole issue for decision is whether petitioners may deduct legal fees incurred in connection with an inverse condemnation suit arising out of a dispute over mineral rights reserved in a deed to the United States. Petitioners contend that the legal fees are deductible because the primary purpose of the litigation was to enable them to conduct a quarry business. Further, petitioners contend that if the primary purpose test is inapplicable, the litigation expenses are nevertheless deductible because the origin of the claim was not in the acquisition or disposition of petitioners' mineral interest. Respondent contends that the primary purpose test does not apply and that the legal fees must be capitalized because the origin of the claim was in the disposition of petitioners' mineral interest.

All of the facts have been stipulated. The stipulated facts and attached exhibits are incorporated by this reference and summarized below. With regard to docket No. 24534-83, the parties also submitted a stipulation of settled issues.

Petitioners James Mosby (Mosby) and Virginia Mosby (collectively, the Mosbys), husband and wife, resided in Lompoc, California, at the time their petition was filed. They filed joint Federal income tax returns in 1977, 1978, and 1979. Petitioners Jack Foster (Foster) and Patricia Foster (collectively, the Fosters), husband and wife, resided in Paso Robles, California, at the time their petition was filed. They filed joint Federal income tax returns in 1978 and 1979.

On June 11, 1942, the United States exercised an option to purchase for $22,750 the surface estate of a certain tract of land referred to as Tract 83. The land was acquired as part of the activation of Camp Cooke, now Vandenberg Air Force Base (Vandenberg), as an Army facility to train armored and infantry divisions.

In the transaction, the seller, the McClellans,[1] reserved the right to all minerals in Tract 83. That reservation is expressed in the deed to the United States, dated June 11, 1942, as follows:

EXCEPTING AND RESERVING to grantors, their successors and assigns, the following:

All oil, gas, asphaltum and other hydrocarbon substances and other minerals, including diatomaceous earth, in and under the land hereby conveyed, together with all easements, roads and privileges reasonably necessary to explore said land for, and to produce and transport therefrom, any of said minerals; provided, however, that the rights granted by virtue of this reservation shall not be exercised by grantors for period of not less than five (5) years from the date hereon or during the present national emergency, whichever period is longer.

The McClellans were aware that Tract 83 contained sedimentary and ocean-borne rock deposits with potentially substantial commercial value as quarries but had made no attempt to ascertain the composition or nature of the particular deposits.

---

[1]Charlotte Mildred McClellan was the beneficial owner of the fee simple interest. The Bank of America National Trust & Saving Association held legal title and was named grantor on the deeds to the United States. Mrs. McClellan's husband generally managed and exercised responsibility over Tract 83.

In 1969, due to several requests by private contractors and State officials to enter Tract 83 and extract various minerals, Headquarters at Vandenberg sought advice from the Chief of the Real Estate Division, Los Angeles District, United States Corps of Engineers, concerning its right to refuse entry to those interested parties. Vandenberg was advised, among other things, that sand and gravel were not minerals and that the McClellans had no right to quarry stone or to authorize others to quarry stone on Tract 83 as that right was exclusive to the Government.

Mosby, as a teenager, had experience in working on mineral claims that involved hard-rock mining and quarry operations. As an undergraduate at Oregon State College, he took all the geology courses available to undergraduates, including mineral identification. In June 1968, Mosby acquired a lease of a rock quarry within 10 miles of Tract 83; he operated that quarry for approximately 3 years. Mosby had also operated a dental practice, developed a parcel of farm land (rice crop), and developed or was in the process of developing a restaurant, a small commercial store, and a medical/dental center in Lompoc.

Foster was a general engineering contractor with extensive experience in rock quarry operations. He had operated his own construction company since 1957. His background included quarrying operations in the Philippines, in Alaska, and on the central coast area of California. Since 1958, his contracting activities have involved building roads, reservoirs, quarry work, building sites, and subdivisions. He owned a 400-space trailer park and a condominium complex and developed, in a joint project, a 22-house subdivision. As of 1981, he owned a ranch containing a redrock quarry.

Foster and Mosby met in 1969, at which time Foster's activities involved mining operations in the See Canyon, Missile City, Morrow Rock, and Cambria Pines quarries. Approximately 2 years later, they entered into an oral joint venture agreement to acquire a mineral interest in Tract 83. On July 8, 1971, petitioners executed a lease with the McClellans wherein petitioners acquired the right to extract certain minerals from Tract 83, i.e.,

> Lessee shall have the right to extract and remove and take from the premises all riprap rock and this lease does not include sand, gravel, diatomaceous material or petroleum products.

At the time of execution of the lease, neither petitioners nor the McClellans knew of any denial of access to the property or of any dispute as to the right to quarry and remove the rock.

There is a market for riprap in the geographical area of Tract 83; such market is limited by the distance over which stone can be hauled economically from its source and by the proximity of competing rock sources. As of 1981, the quantity of dolomite in the Tract 83 deposits suitable for riprap and other construction uses could likely satisfy the demand reasonably anticipated for approximately 25 years.

In November 1971, Mosby requested permission to survey, drill-test, and remove a rock from Tract 83 known as dolomite. The request was denied on November 18, 1971, on the ground that dolomite was not a mineral within the meaning of the reservation in the 1942 deed "because it is desired for use as rock and not for the extraction of any minerals therefrom." In response to this denial, petitioners reiterated their request, arguing that dolomite has a definite chemical composition; that the subject deposit could be quarried for 12-ton size rocks for use as riprap; that they had an oral contract to supply a minimum of 50,000 tons of dolomite riprap rock for use on a certain project at a price of $4 per ton; and that the Government's continued denial would jeopardize this oral contract and lead to legal action for damages in inverse condemnation. Permission, however, was still not granted.

On March 10, 1972, petitioners received from the McClellans a deed to real property in Tract 83:

> All oil, gas, asphaltum and other hydrocarbon substances and other minerals, including diatomaceous earth, in and under the land described below, together with all easements, roads, and privileges reasonably necessary to explore said land for, and to produce and transport therefrom any of said minerals.

At the time of the deed, petitioners knew that the United States claimed ownership of the subject dolomite deposits.

In April 1974, petitioners presented a claim to the Government under the Tort Claims Act for damages in the

amount of $18,750,000, based on a deposit of 25 million tons, valued at a royalty rate of 75 cents a ton in place. Petitioners asserted that the dolomite deposit was ideally suited for economic and profitable extraction as riprap and that "it is not the dolomite mineral as such which is profitable to extract, but the dolomite rock as it exists in its natural state." In October 1974, the Government denied petitioners' claim on the ground that petitioners did not acquire any right to remove dolomite rock because it was not a mineral within the reservation clause of the 1942 deed and because the "anti-assignment statute" barred petitioners from asserting such a claim against the Government.

In February 1975, petitioners instituted a suit in the U.S. Court of Claims alleging entitlement to monetary relief on the ground that property had been taken without just compensation contrary to the mandate of the Fifth Amendment of the U.S. Constitution. See *Foster v. United States*, 221 Ct. Cl. 412 607 F.2d 943 (1979). Specifically, petitioners argued that the phrase "and other minerals" in the deed to the United States be interpreted under well-established principles to construe reservations in deeds in favor of the grantor; that the phrase was intended by the parties to include dolomite; and that it was common practice to employ this phrase to reserve all substances which can be extracted to yield value.

The Government raised five defenses: (1) Plaintiffs were barred by the Anti-Assignment Act, 31 U.S.C. sec. 203 (1976); (2) the deposits in question were not a mineral; (3) the deposits were not included in the mineral reservation; (4) there had been no taking of property; and (5) if the deposits were mineral deposits, and there had been a taking, the value thereof did not exceed $30,000. The Government conceded that the subject deposit would be within petitioners' ownership if it was a mineral and if it was contemplated by the customary reserve language used in California deeds.

The Trial Judge of the Court of Claims found that there had been a temporary taking and awarded plaintiffs $23,250. Upon review, the Court of Claims found that (1) plaintiffs' claim was not barred by the Anti-Assignment Act; (2) the dolomite deposits were a mineral; (3) the

dolomite deposits were within the reservation of minerals retained by the seller in the sale to the United States; and (4) the Government's denial of access to the deposits constituted a permanent taking which occurred as of November 18, 1971, entitling plaintiffs to compensation under the Fifth Amendment. Thereupon, the matter of a determination of damages was left for further proceedings.

During the years in issue, petitioners deducted legal expenses incurred while pursuing the claim against the United States for inverse condemnation. Respondent disallowed the deductions on the ground that they were capital expenditures under section 263.[2]

Petitioners contend that they are entitled to current deductions under either section 162 or section 212 for legal fees incurred in connection with the Court of Claims proceeding. Petitioners, however, do not seek a deduction for legal fees incurred after the decision by the Court of Claims that there was a permanent taking, as there was then a binding judgment that an inverse condemnation had in fact occurred. Respondent's position is that the fees in dispute are not currently deductible but must be capitalized pursuant to section 263. Petitioners bear the burden of proving entitlement to the claimed deductions. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

One requirement for deductibility of an expenditure under either section 162 or section 212 is that the expenditure be "ordinary and necessary." Section 263, however, provides that no deduction shall be allowed for capital expenditures. Thus, an expenditure cannot be deducted as an ordinary and necessary expense under section 162 or section 212 if it is a capital expenditure. *Woodward v. Commissioner*, 397 U.S. 572, 576 (1970). As to whether an expenditure is ordinary and potentially deductible or capital and not deductible, sections 162 and 212 are in pari materia and need not be applied separately. See *United States v. Gilmore*, 372 U.S. 39, 44-45 (1963). Thus, we first address the threshold question of whether petitioners' legal fees were capital expenditures under section 263.

---

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

Two types of expenditures that must be capitalized under section 263 are (1) those that involve the cost of the acquisition or disposition of a capital asset, *Woodward v. Commissioner, supra*; sec. 1.263(a)-1(a) and (e), Income Tax Regs.; and (2) those that involve the cost of defending or perfecting title to property, *Reed v. Commissioner*, 55 T.C. 32, 40 (1970); sec. 1.263(a)-2(c), Income Tax Regs.

Petitioners argue that the fees in issue are ordinary and necessary because they meet the primary purpose test, i.e., that although title was involved, the primary purpose of the suit was to enable them to conduct their quarry business. See *Industrial Aggregate Co. v. United States*, 284 F.2d 639 (8th Cir. 1960), and *Lewis v. Commissioner*, 253 F.2d 821, 827 (2d Cir. 1958), affg. 27 T.C. 158 (1956). Respondent contends, however, that the primary purpose test does not apply because it was specifically rejected in *Woodward v. Commissioner, supra.*

In *Woodward*, the Supreme Court denied taxpayers a current deduction for legal fees incurred in connection with the appraisal and acquisition of stock that the taxpayers were required to purchase from a minority shareholder. The Supreme Court held that in cases where the litigation involved the acquisition or disposition of a capital asset, the origin of the claim, not the primary purpose of the litigation, is the controlling test in deciding whether the expenditures should be capitalized. This Court subsequently extended the origin of the claim test to expenditures incurred in litigation of title to property. *Boagni v. Commissioner*, 59 T.C. 708 (1973); *Reed v. Commissioner, supra.*

The origin of the claim is the appropriate test for determining the deductibility of the legal fees incurred in a direct condemnation suit. *Madden v. Commissioner*, 514 F.2d 1149, 1151 (9th Cir. 1975), revg. 57 T.C. 513 (1972). In *Madden*, a taxpayer sought to deduct legal fees incurred in resisting a public utility's condemnation of taxpayer's land for use as a reservoir. Focusing on the nature of a condemnation proceeding, the Court of Appeals for the Ninth Circuit stated that a controversy where the Government attempts to appropriate taxpayer's land and taxpayer resists is "inherently related to the sale and acquisition of land." *Madden v. Commissioner*, 514 F.2d at 1151. There-

upon, the court held that the origin of the claim test, as set out in *Woodward*, applied and denied the taxpayer's deduction. Subsequently, this Court adopted the origin of the claim test with regard to direct condemnation proceedings. *Soelling v. Commissioner*, 70 T.C. 1052 (1978).

Petitioners argue that an inverse condemnation is materially different from a direct condemnation. Specifically, petitioners contend that in a direct condemnation the Government establishes its need for a capital asset, files a Declaration of Taking, and sets out to acquire the property but that in an inverse condemnation the "key question is whether *any* taking occurred" as a result of the Government's unintended and "almost accidental" possession of, or interference with, an asset. We do not disagree with petitioners' analysis of the distinctions between direct condemnation and inverse condemnation; however, it does not convince us that the origin of the claim test should not be applied here. The reasons that the origin of the claim test was adopted over the primary purpose test in other cases equally apply to expenses incurred in an inverse condemnation suit. For example: (1) The origin of the claim is a simpler and more certain inquiry, *Woodward v. Commissioner, supra* at 577; (2) "A test based upon the taxpayer's 'purpose' in undertaking or defending a particular piece of litigation would encourage resort to formalisms and artificial distinctions," *Woodward v. Commissioner, supra* at 577; and (3) the origin of the claim requires an objective examination of all the facts, *Boagni v. Commissioner, supra* at 713, rather than a subjective analysis of a taxpayer's "purpose" or intent. Thus, the origin of the claim is the proper test for determining if expenditures incurred in an inverse condemnation must be capitalized.

In *Boagni v. Commissioner, supra*, we defined the origin of the claim test as follows:

Quite plainly, the "origin-of-the-claim" rule does not contemplate a mechanical search for the first in the chain of events which led to the litigation but, rather, requires an examination of all the facts. The inquiry is directed to the ascertainment of the "kind of transaction" out of which the litigation arose. Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended,

the background of the litigation, and all facts pertinent to the controversy. [59 T.C. at 713. Citations and fn. ref. omitted.]

Applying these criteria to the facts herein, we hold that the origin of the claim involved the disposition of a capital asset.

Petitioners argue that their legal fees are deductible even applying the origin of the claim test. Petitioners contend that the fundamental issue was whether there had been a taking; that the nature and objective of the litigation was "to force the Government to allow them access to their mineral deposits" to conduct their business; and that the background of the litigation involved the Government's continued denial of access to the property. Based on these alleged factors, petitioners posit that the origin of the claim involved their profit-making activity, not the acquisition or disposition of a capital asset.

We disagree with petitioners' summary of the facts and with the result petitioners proffer. Before the litigation ensued, both parties claimed ownership of the deposits of dolomite. Petitioners filed their claim against the United States on the ground that their property had been "taken" by inverse condemnation. Prior to the trial, petitioners repeatedly attempted to gain access to the property. However, contrary to what petitioners suggest, they did not seek in the *litigation* to gain access to the disputed property to conduct a mining operation. Rather, they requested compensation under the Fifth Amendment, which the Court of Claims awarded on the basis of a "permanent taking." Thus, the nature of the claim involved the disposition of a capital asset.

Petitioners also argue that income from a temporary taking is ordinary and because the Trial Judge found a temporary taking, although the Court of Claims subsequently held that the taking was permanent, the legal fees in issue should be deductible ordinary expenses. Petitioners, however, are isolating and highlighting one step in the chain of events and ignoring all the other objective facts. A temporary taking presupposes that Government interference or possession will cease. This was not the nature of petitioners' claim; as already discussed, petitioners sought only monetary relief for the taking of their property, not

access to the property. Thus, the Trial Judge's finding of a temporary taking does not alter the result where all the objective facts indicate that the origin of the claim was in the disposition of a capital asset.

The legal fees must be capitalized under section 263.

> *Decision will be entered for the respondent in docket No. 24519-83.*
>
> *Decision will be entered under Rule 155 in docket No. 24534-83.*